We are now ready for our remaining cases this morning. We now have Peterson v. Lesser. Mr. Tomaszewski. Thank you, Your Honor. May it please the Court. I begin with the fundamental proposition that the Illinois in pari delicto defense has no application to this case. There is no claim that Mr. Bell or the Lancelot funds… How can you begin with the very thing that is to be established? That's correct, Your Honor. There is no claim that Mr. Bell or the Lancelot funds committed the same wrong as the auditors. Well, that's the question in this appeal, whether the wrong has to be the same wrong. And I will… You can't begin by begging the question. We hope you will engage the question. I intend to do that, Your Honor. The district court held that Mr. Bell and thus the funds falsely represented to investors that Costco would make payments directly into the Thousand Lakes lockbox account. But assuming for argument's sake that that was a material misrepresentation to investors, that's not the wrong underlying this lawsuit. The auditor's wrong was against their client, the funds. They failed to perform basic and necessary testing to determine whether the notes on the funds' balance sheets were collateralized and had any value. The damages they caused were the funds' expenses and losses from the time the auditors delivered their January 5, 2007 audits, which is the same sort of claim made in the Board of Trustees against Coopers and Librand case. On the other hand, an investor could claim damage only for the amount he or she lost in reliance on a representation that Costco would pay directly into the Thousand Lakes lockbox. The trustee has no standing to assert those claims. Thus, the legal nature of the two wrongs is different. The victims were different, and the measure of damages is different. Now, the district court relied on… I'm certainly willing to assume all of those things. The question is, does that matter under Illinois law? It does very much, Your Honor. The district court relied on Knauer for a holding that all that matters is that the damages to be caused were the same, even if the wrongs were different. But that reliance was misplaced for several reasons. First, its dictum. It was a description of the defendant's argument, not the court's holding, which applied no such rule. Knauer was a run-of-the-mine case in which the receiver for an entity that was a Ponzi scheme sought to shift responsibility to others. In this case, the funds were not a Ponzi scheme. They were the victims of a Ponzi scheme. Second, the damages to the funds did not result from any potential fraud on the investors. Indeed, as this court said in Senko and in Knauer, if there was a fraud against investors, it would have benefited the funds. What damaged the funds was their investment in the notes. Had the notes been real, the funds would have suffered no harm, and had the auditors done their job properly, the funds would have suffered much less harm. The district court made the unsupported leap to conclude that Bell's alleged fraud, like the auditors' malpractice, contributed to the funds' losses. But if we're to take Senko at face value, Bell's alleged fraud did not contribute to the funds' losses, nor has there been any fact-finding on the extent to which the losses might overlap. The district court appears to have assumed... Counsel, I'm really trying to figure out what Illinois law provides about whether the wrongs have to be in the same respect and cause the same injury. You want to distinguish a case on which the district court relied, but I'm trying to figure out what you're relying on. Are there any Illinois cases that pose this question and resolve it one way or the other? There are, Your Honor, and in our brief we cited in particular the Halloran case. Yes, I've read the cases you cited in your brief, and they don't stand for the proposition for which you cited them. That's why I'm asking this question. I can't find any Illinois cases one way or the other on this question. Well, first of all, Your Honor, the Halloran case, I believe, makes it very clear that even if the plaintiff committed a wrong with respect to certain property that's the subject of the lawsuit, that that doesn't bar him under imperi delicto from suing unless he's suing to recover for that particular wrong. In this case, the trustee is not suing to recover for any wrong committed by Mr. Bell, nor did Mr. Bell commit any wrong, if the district court is to believe, that contributed to the harm. Halloran, by the way, has never been questioned or overruled by any Illinois court. The auditors cite a so-called modern trend toward expanding the imperi delicto defense, but if there was such a trend, it hasn't reached Illinois in the way that the district court described it. In fact, even in Peltz, which is the Second Circuit case that they cite for the so-called modern proposition that the imperi delicto defense should not be applied in a hyper-technical way, the Second Circuit has issued rulings that go the other way since that time. For example, in the Brandade case, where the court said that the doctrine of imperi delicto means more than just two wrongs make a right, application of the doctrine requires that the plaintiff be an active, voluntary participant in the unlawful activity that's the subject of the suit. There's never been an Illinois case that said anything different. And if it's true, as Your Honor says, that there's no Illinois case holding one way or the other whether joint damage causation is sufficient, even if there's no joint wrong, for this court to take the leap and decide that Illinois would hold that way is totally unjustified. There's no basis on which this court citing Illinois law... What do we know about how other states have dealt with this question? Other states have dealt with this question in a variety of ways, and there's no single trend, and there's no reason to believe that Illinois would adopt that trend. I'm not worried about trends. This isn't some kind of cannonball that has an arc and goes, right? If you try to count what other states have done, where are we? I haven't counted that, Your Honor, but I do know that fairly recently in Illinois there have been cases on the question of audit malpractice, and the Illinois courts have never taken this leap in that regard. My question is about other states, not about Illinois. I don't think Illinois has any law about this one way or the other. Look at what other states have done. Can you define a majority approach, a minority approach, or are they nearly as sparse as Illinois? I don't think there's a majority approach that says that simply joint damage causation is enough even if there's no joint participation in a wrong. That's not what the impari delicto defense is about, and that's what the court below said. All that was necessary was joint damage causation, and the court was wrong about that, by the way, because there is no joint damage causation. There are really two grounds in that regard. As I say, the Second Circuit, which is one of the cases that was featured by the auditors as establishing this modern trend, has not applied that modern trend because they say that it requires that the plaintiff be an active participant in the unlawful activity that is the subject of the suit. This notion of joint damage causation being sufficient as a matter of law is not something that a majority of states have adopted, and even if they did, I come back to the notion that there is no joint damage causation here, or at least summary judgment is not the way to appropriately establish that fact. The cases that involve audit malpractice often focus as much on knowledge as on wrongful behavior. There are some cases, like the Parmalat case, in which the auditors are alleged to have actually joined with the client in the fraud, but most of the time the auditors are accused of failing to uncover or to reveal facts about the client's condition. But a wrongdoer obviously can't sue an auditor for failing to uncover a wrong of which the wrongdoer is by definition already aware. In the Ponzi scheme cases involving auditors, the audit client was the Ponzi scheme. Here it can't be stressed too highly. The audit client was the unknowing victim of a Ponzi scheme. The District Court conceded it was a matter of contested fact whether Bell and thus the funds knew that Petters was involved in the Ponzi scheme and that the notes were a sham. Perhaps a jury would find that he did know, but for now that's no basis for summary judgment. The District Court also relied on the argument that had Bell insisted on Petters' compliance with the flow of funds from Costco to Thousand Lakes, as described in the offering memoranda, he would have discovered the Ponzi scheme for himself. But there are no Illinois cases holding that the in pari delicto defense applies where the auditor failed to discover facts that the client also failed to discover. Indeed, as this Court said in Williams Electronics, the in pari delicto defense does not apply to facts that plaintiff should have known, or as the case also said, you can't blame the victim for carelessly failing to discover that it was a victim. Well, it's undisputed that Bell knew there was no lockbox and continued to represent that there was, both to investors and to the auditors. To be clear about that, Your Honor, there was a lockbox. There was no lockbox. Yes, there was a lockbox, Your Honor. The issue is not whether there was a lockbox. There was no lockbox as originally represented and continuously represented during the course of the relevant time period. There was some substitute arrangement put in place that bore no relationship to the lockbox as described, as Bell himself admits, knowingly misrepresenting. Again, let me be clear, Your Honor. There was a lockbox, and a lockbox by definition controls A lockbox as commonly understood and as it was understood and represented in this case would have prevented the Ponzi scheme operator, here Petters, from accessing it, and that was not the substitute arrangement that was put in place. Your Honor, a lockbox by definition controls who can withdraw funds from it. It doesn't control who can deposit funds in it. The issue is not whether there was a lockbox. The issue is whether the deposits into the lockbox were made directly by Costco or whether they were made by PCI, which is another Petters entity. Right, I understand that. So the flow of money into the lockbox was now Petters. Actually, not now. From the get-go, it was Petters. That's right, Your Honor. There was never any lockbox that received money from retailers, and Bell knew that from the get-go, and he continued to represent that there was a lockbox, the flow of money into which came directly from the retailers. That's the fraud here, and it's a fraud not only on the investors, but it's a fraud on the auditors. Well, first of all, it's not a fraud on the auditors because he did not represent that to the auditors. In fact, he made available to the auditors the documents that showed that the arrangement that was the protection, the specific protection that the lockbox was intended to provide, which was that Petters could abscond with the funds before the notes were paid, which, by the way, didn't happen in this context. But there was the alternative arrangement that the Cat Muchen firm put into place, and that information was provided to the auditors. They never asked why it was done. In fact, they never even regarded it as material. Mr. Lesser testified that in his audit, he never looked at the lockbox account, which is a bit odd since it was a very important account for his client. But he never looked at it, and the evidence also shows that the auditors' audit planning documents did not call for inspecting the lockbox account. So as far as the auditors are concerned, it doesn't really look like what came into the lockbox or where it was from was at all material to them. As far as Mr. Bell is concerned, he brought this issue to his lawyer's attention. The lawyers drafted an alternative protection for the particular kind of harm the lockbox was put in place to protect against, which was that Petters would abscond with the funds before they made it into the payment of the notes. And that protection was implemented, and Mr. Bell believed that that was adequate substitute for what was in the offering circular. Whether that was even material to investors is open to question. We know, for example, that the Banco Popular, which was the fund's lender, was aware of the fact that the deposits were not made into the lockbox by the retailers, yet they extended $50 million worth of credit. So apparently it wasn't that relevant to them or material to them. There's too much focus, I think, on this lockbox issue, because while it's true that had Costco made deposits into the lockbox, that would have been conclusive evidence that there was a Costco, the fact that Costco didn't make deposits directly into the lockbox is not evidence, really, of any kind that there wasn't a Costco. The money was deposited, the correct amounts of money were deposited in the lockbox account for years in the hundreds of millions of dollars. That's no red flag that Costco's not involved in the transaction. So the lockbox was not there to protect against the Ponzi scheme. It was there to protect against absconding with the funds before the notes could be paid, and it served that purpose, at least as far as anyone looking at it was concerned. The lockbox protected who could withdraw the money. It did not control who could deposit the money. Anyone could deposit money into the lockbox. It existed, and that was its purpose. Now, an auditor's role, as this court stated in its earlier opinion, is in part to do some independent verification to learn whether the client's controls are working. And as the Illinois Supreme Court said in the Board of Trustees against Coopers and Librand case, a client's poor business practices can't be asserted as a defense to the auditor's negligent failure to make that kind of independent verification, or put another way, as Coopers also held, quoting the restatement of torts but making it specifically applicable to audit malpractice cases, in a case involving negligent rendition of services, a fact finder does not consider any of the plaintiff's conduct that created the conditions the service was employed to remedy. And in Holland, the Illinois Appellate Court made a similar point. Given the peculiar and particular role that auditors play, they should be held to their contractual obligations unless their client prevents them from doing so. Here, there's no allegation that the funds prevented the auditors from doing their job. To be sure, the auditors say that they relied on certain things that Bell told them. But that was their choice, not a barrier to their work. And indeed, that choice is the problem. There was none of the required professional skepticism. Independent verification can't mean simply asking management what's going on and taking their word for it. I'd like to say a couple of other things. One is about the 2008 audits. Had the auditors properly done their job with respect to the January 5, 2007 audits, there never would have been any January 5, 2008 audits. So while the role of Bell's 2008 round-trip transactions has received a lot of play in the district court's opinion and in the briefs, the court doesn't need to resolve the question whether the round trips were a fraud on behalf of the funds that can be attributed to them or Bell's theft of the fund's money that was adverse to the fund's interest. There's no undisputed evidence that Bell knew about or participated in Petter's Ponzi scheme at the time the auditors delivered the January 5, 2007 audits. Thus, the impari delicto defense can't apply here on summary judgment. I see I've gone into my rebuttal time. If the court has no further questions, I'll sit down. Thank you, Mr. Tomaszewski. Good morning. May it please the court. Mr. Farina. Stephen Farina from Williams & Connolly on behalf of the defendants' appellees. The foundational principle for the impari delicto doctrine in Illinois and throughout the rest of the United States is that a wrongdoer should not be permitted to come to court and have the court assist in the shifting of the consequences for his own wrongdoing to someone else who is either equally at fault or less at fault. Equally at fault for what? The argument that's being made by the trustee is that Bell is not equally at fault for the particular loss. Bell bears fault, but not for the same thing. So these aren't corresponding wrongs. That's their argument. And I must say, as I told Mr. Tomaszewski, I can't find any case in Illinois deciding one way or the other whether that supports an impari delicto defense. Have you found a really dispositive case? Not on these precise facts, but the articulation of the test in Illinois, in the Holland case, and elsewhere. What you've cited are general statements of the defense which don't resolve this question about whether the wrongs have to be corresponding. Now, what does the law look like in other states? The test in other states, and I believe in Illinois, is whether the wrongdoing contributed to the injury for which they're seeking recovery. So the question here is whether or not the wrongdoing by the funds caused, at least in part, the injuries for which they're seeking recovery. We are not claiming that any independent wrong would be enough to bar Mr. Bell or the funds from seeking recovery against anyone. There has to be a relationship between the injury for which they're seeking recovery and their own wrongdoing. If their own wrongdoing is a cause, then under, I think, every jurisdiction's law, that claim is barred, and that is the case here. You're not addressing my question. I'm trying, Your Honor. I don't think that the other courts... What you want to do is state the impare delicto defense at a very high level of generality, and then run with it. I'm trying to be more particular, to see whether other states have addressed the question, whether the two wrongs have to have some similarity to each other, or be joint in some way. All right. I think clearly they have. In the Peltz case, for example, in the Second Circuit... I don't know about you, but I don't think the Second Circuit is a state court. I'm looking for what state courts have said, because this is a question of state law. Your Honor, in the Williams case, the Williams-Lextronix case, this court was applying Illinois law... This court is not a state court. I really want to know what state courts have said. Well, in the Halloran case, which is the case from 1891, the Illinois court said that the recovery would be barred where the debtor, the plaintiff, was seeking relief from the fruit of his own wrong, from the consequence of his own unlawful act. That is the test. And that test can encompass a scenario where the plaintiff and the defendant have done different things wrong. And in most impaired delicto cases that are decided... Look, you're entitled to rely on generalities, and we'll do the best we can, but I understand your answer to be saying either that other states haven't grappled with this any more than Illinois has, or if they have, you don't know what they've said. Your Honor, we have cited federal court cases that are applying state law, including this Seventh Circuit applying Illinois law, and the Seventh Circuit applying Wisconsin law. And in none of those cases has the federal court, at least, interpreted state law as requiring the plaintiff and the defendant to have engaged in precisely the same wrong. And in fact, in most impaired delicto cases that are decided across the country, the plaintiff has engaged in some wrong that is qualitatively worse or qualitatively different. Those were the words that were used in the Peltz case, that the wrong was qualitatively different. The Second Circuit, I understand it is a federal court case, but it was specifically addressing this issue because the plaintiff in that case argued that the wrongs were different. And the court said, we understand they may be qualitatively different. However, that is not a bar to impaired delicto as at least that federal court understood state law. And frankly, Your Honor, the issue is not addressed in that fashion. Peltz is an unusual case in that it does because the standard that all of the cases articulate, frankly, is a standard that we would meet easily. And that is the standard that governs the analysis that all of these courts have applied. But the Peltz case cites another Second Circuit case. The Naur case, which was this court interpreting Wisconsin law, did not look to a situation where the plaintiff and the defendant were alleged to have done the same wrong. And that's also true in the Williams-Lextronix case. The parties were not alleged to have engaged in the same wrong. The question is, is the plaintiff trying to shift the burden, shift the responsibility for their own misconduct to someone else? And the idea is... Counsel, let me tell you what bugs me. Maybe this is just me rather than genuine state law. But the nature of the holding of the district court boils down to once the principal of a company defrauds the investors and injures them, everybody else is free to defraud the investors too. They get a free pass, except maybe for criminal prosecution. So in corporate law, we've got a whole bunch of people who are supposed to have independent duties to protect the investors. They're the management. They're the lawyers. They're the auditors. They all have duties to the investors. And the gist of your argument and of the district court's holding is that as soon as we get one defaulcation, everybody else can do what they want. They can go home. They can take a vacation. They can defraud the investors. Is that really what Illinois law stands for? Your Honor, that is not the rule. I don't believe that is the rule anywhere. And that is not the rule that the district court applied or the rule that we are advocating. In our brief, we specifically say that it's not open season on wrongdoers if a wrongdoer commits a wrong. There has to be a causal link. The issue is whether or not the wrongdoing is of a nature that it contributed to the injury for which they're seeking recovery. Well, that's exactly what I just said. The corporate insider defrauds investors so that they put up money into a venture that is more risky than they think. And then the second person whose job is to protect them from business risks doesn't have to protect them anymore. And so the risk is even larger than it might otherwise be. The nexus here is, first of all, far greater in that it wasn't simply a lie about a particular measure. It was a lie that allowed the Ponzi scheme to continue. The allegation here is that the funds should not have been allowed, the funds should not have been allowed to continue in existence. And the funds should not have been allowed to continue investing in the Ponzi scheme. The Ponzi scheme was permitted, was facilitated, was prolonged by Lancelot's misconduct. As Your Honor has said in appeals involving these facts, a Ponzi scheme needs funds, it needs cash to survive. Lancelot provided two and a half billion dollars of money that it built from its investors by lying to its investors about the Petters arrangement. And in particular about a particular You're not dealing with my worry. Bell could, of course, by more diligence have brought this Ponzi scheme to a halt. And so could Magladry and Pullen. The allegation of this complaint is that Magladry and Pullen was asleep on the job. And of course the allegation in the next case, which you may enjoy hearing, is that O'Rourke was asleep on the job, that there are other people who contributed. Well, the fact that there was some loss in common is the cornerstone of the district court's analysis and ultimately yours. And that's exactly what gets me worried. That as soon as somebody puts the investors at risk, everybody else  at more risk. Let me try again to address it. First of all, the doctrine of imper delicto when it is applied in every single case involving an auditor, including the Bondi case, which was just decided by the Illinois court on remand from this court, applies in a circumstance where there is an allegation that the auditor was asleep on the job or worse. And the auditor, had they done their job, had they done what was in the contract, would have avoided the losses. So that is true in every single instance when the imper delicto doctrine is applied. That does not mean, though, that the auditor is absolved from all potential liability from all sources. Magladry and Pullen has been sued by the investors. There are multiple investor lawsuits that remain pending in other jurisdictions that have been stayed pending this. This case, this case, is about whether the trustee in Greg Bell's shoes. Greg Bell is a crook and Greg Bell would not be allowed to sue Magladry and Pullen for losses that he contributed to. Neither can the trustee. Now, do the investors have independent claims? They have certainly pleaded them and those will be adjudicated. But it's not open season just because the plaintiff has engaged in willful misconduct. But it does bar that plaintiff's claim. That's how imper delicto is supposed to work. That's how it works in Illinois. That's how it just worked in the Bondi case. Where in that case, Grant Thornton was alleged not to have just been asleep on the job but to have been complicit in the fraud. So, Your Honor, I understand the concern. It's a concern that would exist in every single instance in which the imper delicto defense is applied. But that is the law. That the trustee standing in the shoes of Lancelot cannot seek to recover for damages that Lancelot caused. Even if Magladry may have caused them  funds. Even if Magladry could have prevented them. That arguably was true of Winston. That arguably is true of Catton. The trustee has alleged that a whole bunch of people could have come in and prevented this loss from occurring. What we do know is that the willful knowing misconduct by the funds allowed the Ponzi scheme to continue. Allowed the funds to continue. The Ponzi scheme never would have been able to last as long as it did if Bell had not made material misrepresentations to his investors and raised money from his investors that was the fuel for the Ponzi scheme. In those circumstances under settled law the claim is barred. The claim by the trustee standing in Bell's shoes. Now in respect to the lockbox the the lockbox was supposed to prevent anyone else from touching the money. The money was supposed to come directly from Costco. Bell admitted in his deposition that if the money had come directly from Costco as he had represented to the world then that would have been compelling evidence that Costco was actually a party to the transaction and these transactions had substance. He further admitted that he knew that his investors took comfort from that particular feature. And he admitted that the reason why he never told investors the truth is because he knew they took comfort. And in a prior appeal in the Winston appeal this court said that if the truth about the lockbox had been revealed it likely would have brought an abrupt end to the funds. And that's why Bell never told anyone the truth. So the funds were able to exist by virtue of his knowing misrepresentations and the Ponzi scheme was allowed to continue because of his knowing misrepresentations. So the lockbox had a designed feature two design features one the input and the other meaning who had access to withdraw. And neither of those worked because all of the money went through Petters. And Bell admitted that in his deposition. It wasn't exclusively an outflow lockbox. He admitted that the fact that all of the payments were supposedly coming directly from Costco without passing through any third party's hands was conclusive or at least persuasive evidence that Costco was a party to the transaction. And it wasn't simply Lancelot giving Petters money and then Petters giving the money back which looks like could be a Ponzi scheme. I want to go back to the discussion of imperi delicto and the focus that you're describing that the doctrine places or as you're positing the doctrine on the nature of the harm rather than the nature of the wrong. And when you describe the doctrine that way it sounds like a species of clean hands. Well the Supreme Court has actually said that the doctrine has evolved beyond its original conception to be essentially a variation of unclean hands. And that's in either the Pinner case or the Bateman-Eichler case. But there's been a recognition including by this court in the Williams Electronics case that the doctrine has evolved beyond the original circumstance of for example two parties to an illegal contract. And as this court said in the Williams Electronics case it's evolved to scenarios where two parties have equal or greater responsibility for the same harm. The doctrine applies. Not that it applies where the plaintiff has equal or greater   wrong. Well it's articulated in both ways in the cases but the idea if you look at the premise underlying it is that the plaintiff has equal responsibility for the consequences of wrongdoing. So that's why they look at the consequences, the harm that is sought to be redressed because the idea is just unseemly to have a court helping one wrongdoer over another. And that's the idea. So you're not allowed to shift the consequences of the wrongdoing which is why the courts do look at this idea of whether they're seeking to shift responsibility for the injury. So again, it's not some completely unrelated wrong. It is bounded but it is bounded by not whether they did exactly the same thing wrong but whether or not the plaintiff is in some ways responsible for the expenses incurred by the funds' continued existence. So the idea is that if we had discovered the Ponzi scheme, the Lancelot funds would have stopped incurring charges and expenses. Which is crazy since the reason why the funds continued in existence was because of Bell's lies to investors that allowed him to raise additional money. Now, we haven't talked a whole lot about the round-trip transactions. The round-trip transactions are qualitatively the same as the lock-box fraud in that the round-trip transactions defrauded the investors and allowed the Ponzi scheme to continue unabated. And this court and other courts have repeatedly acknowledged that the round-trips allowed the Ponzi scheme to continue. Now, that's qualitatively the same as the lock-box fraud because both of those deceits by the funds allowed the Ponzi scheme to continue by concealing the fact that it was a Ponzi scheme and by providing funding from the investors to the Ponzi scheme. We also have an alternative basis for    scheme. The Ponzi scheme is officially valid and the issue is whether or not it applied. Illinois enforces exculpatory clauses. It enforces very broad exculpatory clauses and it applies basic principles of contract interpretation. So the issue is whether or not applying this contract as it's written unambiguously, whether or not it bars the claim. And it clearly does. The exculpatory clause in this case says that all claims arising out of circumstances in which there has been a known misrepresentation are barred. That's what it says. That's the plain language. That's what the plain language says. If you just apply the plain language as it's written, it applies here. Bell admitted that he made knowing misrepresentations. He made knowing misrepresentations in 2007, in 2006, in 2005, and in 2008. He made knowing misrepresentations to investors. He made knowing misrepresentations to the auditors. And the claims clearly arise in circumstances of those misrepresentations. The misrepresentations were about the structure of the Petter's investment. So simply applying the plain language of those terms, wholly apart from imperi delicto, the claims are barred. And there's no requirement of materiality that's written into that language. There's no requirement of audit interference that's written into that language. That's not the language that the parties agreed to. And Illinois has made clear that they will enforce exculpatory clauses as they're written. And this one as written bars the claim. And in fact, Illinois has a narrowing principle, and that narrowing principle is satisfied in this case. And therefore, either because the claims are barred by imperi delicto, or because of the exculpatory clause, the judgment should be affirmed. Thank you. Thank you, Mr. Farina. Anything further, Mr. Tomaszewski? Yes, Your Honor. Let me first briefly address the exculpatory clause issue. It's true that Illinois courts enforce exculpatory clauses as written. This one is not written as an exculpatory clause. It's written as an indemnification clause. It doesn't use the word exculpation. It doesn't use the word release. It uses the word indemnification. Now, the auditors rely on the Sweeney Oil case, which they say construed an indemnification clause as an exculpatory clause. And that's true. But in the Sweeney Oil case, the indemnification clause expressly indemnified the defendants for their own negligence. And the Illinois courts have said very clearly that an indemnification clause will not exculpate a party from its own negligence unless it clearly and explicitly says so. This one doesn't. So it's not an exculpatory clause as written. It's an indemnification against third-party claims. It could have been written. There are many exculpatory clause cases. For example, the Harris v. Walker case where a fellow rented a horse and before he was allowed to rent the horse he had to sign an  saying he releases the horse stable from any injury. That's not what this one says. This one says indemnify and it doesn't expressly indemnify against the negligence of the auditors themselves. I want to go back to this question of the lock box for one thing. Again, the purpose of the lock box was expressly set forth in the offering memorandum. The purpose of the lock box was to make sure that Thousand Lakes, which owned the lock box, it was their account, couldn't abscond with the money before paying off the notes. That was the representation made to investors as to why the lock box was there, as to why it's a good idea. There's really been no evidence that any significant number of investors thought that the fact that the deposits coming in from Costco, as opposed to PCI and the hundreds of millions of dollars over many years, was a material fact to their investment. Maybe that was a material fact to their investment, but this is summary judgment, and essentially we're assuming that that would have motivated the investment or would have changed their willingness to invest had they known something different. As I said, it apparently didn't change the motivation of Banco Popular to lend $50 million, a sophisticated entity, so there's no reason to assume favorably to the auditors that that would have affected the investment of the investors in this case. Now, finally, the injury that Bell caused, if he caused one, was not an injury to the funds. The injury, as Senko makes clear, when somebody defrauds investors into investing in the funds, that helps the funds, it benefits the funds, and you can't actually sue for that, and Knauer said that that had to be separated. They dismissed claims involving the investment in Knauer for that very reason, but here the damage was to the funds. It was the funds money that was taken. Thank you, Ron. Thank you very much. The case is taken under